AKRON BAR ASSOCIATION *v.* CATANZARITE.

[Cite as *Akron Bar Assn. v. Catanzarite,*
119 Ohio St.3d 313, 2008-Ohio-4063.]

314

(No. 2008–0423—Submitted June 4, 2008—Decided August 14, 2008.)

**MOYER, C.J.**

{¶ 1} We must determine in this case the appropriate sanction for a lawyer who, in attempting to collect legal fees from two prospective clients, sued them for an amount he knew he had not earned and then resorted to intimidation tactics in the ensuing disciplinary proceeding. Finding that these acts constituted professional misconduct, the Board of Commissioners on Grievances and Discipline recommends that we suspend the lawyer's license for one year and stay the last six months on conditions, including one year of probation. We accept the board's findings of misconduct and recommendation.

{¶ 2} Respondent, Jeffrey A. Catanzarite of Akron, Ohio, Attorney Registration No. 0015203, was admitted to the practice of law in Ohio in 1979. Relator, Akron Bar Association, charged respondent in a multiple-count complaint with violations of the Code of Professional Responsibility and with failing to cooperate in a disciplinary investigation as required by Gov.Bar R. V(4)(G). A three-member panel of the board heard the case in November 2007, found three Disciplinary Rule violations and a failure to cooperate, and recommended the one-year suspension and conditioned six-month stay. The board adopted the panel's findings of misconduct and recommendation.

{¶ 3} Respondent objects to the board's report, arguing first that the findings of misconduct are not supported by the requisite degree of proof. The objections, which merely lament that the panel and board did not accept respondent's version of the underlying events, are overruled. Relator's witnesses testified to the facts set forth in Part I of this opinion, the panel credited these witnesses over respondent's testimony, and consistent with our usual practice in disciplinary proceedings, we defer to those credibility determinations. See *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8.

{¶ 4} Respondent also objects to the board's recommendation, arguing that the sanction is too severe. We disagree. As explained in Part II of our opinion, we find that a one-year suspension with the last six months stayed on conditions, including one year of probation, is appropriate.

## I. Misconduct

{¶ 5} To establish a lawyer's professional misconduct, relator must prove a violation of the Disciplinary Rules with clear and convincing evidence. Gov.Bar R. V(6)(J); *Disciplinary Counsel v. Jackson* (1998), 81 Ohio St.3d 308, 310, 691

N.E.2d 262; *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus. " 'Clear and convincing evidence' has been defined as 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " Id. at 331, 708 N.E.2d 193, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. The proof of respondent's improprieties meets this standard.

### A. Respondent Violated DR 2–106(A) by Charging a Clearly Excessive Fee

{¶ 6} Respondent has a master's degree in business administration in addition to his law degree and has practiced for most of his career in taxation and finance, representing closely held corporations. Sometime in January 2006, David Hirsch called respondent to inquire about retaining his help in resolving difficulties that Hirsch and Robert Joyce, partners in a recruiting firm named Professional Dynamics, were having with a third partner. During their 15- to 20-minute conversation, respondent advised Hirsch that he would not charge for their initial consultation but if hired would require a $1,000 retainer fee and then charge fees as necessary. Respondent, who typically charges $150 per hour, did not specify his hourly rate.

{¶ 7} Hirsch, who admitted his inexperience in dealing with attorneys, and Joyce then met with respondent on January 13, 2006, for one and one-half to two hours. They explained that their third partner had abandoned the business after incurring various debts. Respondent advised Hirsch and Joyce to reconnect with the partner and "bring [him] back as a team player." Joyce testified that respondent, at some point during the meeting, had also mentioned the $1,000 retainer, adding that he would cap his fees at $5,000. Both Hirsch and Joyce testified that they made no commitment to hire respondent, telling him that they wanted to think more before engaging him and intending to consult with another attorney the following week.

{¶ 8} Some time after their meeting, respondent called Hirsch and asked whether any progress had been made with the third partner. Respondent also inquired about obtaining a check for $1,000. Hirsch replied, according to his testimony, that he and Joyce would forward a check to respondent if they decided to hire him.

{¶ 9} Before Hirsch and Joyce's meeting with respondent, Joyce had already tried without success to reconcile the partnership's differences with the third partner. Joyce tried again after the meeting, but the third partner would not meet with him. Joyce testified that he relayed this information to respondent in

a call on January 15, 2006, during which respondent neither offered another course of action nor revisited the matter of his fee. After this conversation, the partners received the following communiqué to Joyce by facsimile:

{¶ 10} "You have already begun implementation of our plan regarding your former partner. We have agreed to my legal fee of $5,000, payable $1,000 immediately and $1,000.00 on the 15th day of February, March, April and May of 2006. I will provide all necessary services to resolve the bank loan issue and the corporate procedures needed to reflect [your third partner's] resignation. This fee shall govern unless litigation becomes necessary * * *."

{¶ 11} A few days after their second telephone conversation, respondent again called Hirsch and asked about his retainer. Hirsch again replied that he and Joyce would pay if they decided to hire respondent. At that point, respondent lost his temper and became profane. He demanded his fee and threatened suit if Hirsch and Joyce did not pay. Hirsch testified to the shock and dismay he experienced after this call, and Joyce testified that Hirsch was visibly shaken when he reported respondent's use of profanity and threats.

{¶ 12} Hirsch never spoke to respondent again. Joyce testified that respondent called him a few more times, offering first to charge a fee of only $1,000 and then of only $300. Joyce did not accept either offer and told respondent that he wanted to consult Hirsch about paying respondent $300. The next day, Hirsch and Joyce were notified that respondent had filed a lawsuit.

{¶ 13} In early February 2006, respondent sued Professional Dynamics in Akron Municipal Court for breach of contract, claiming that Hirsch and Joyce had agreed to pay a $1,000 retainer and a total of $5,000 in fees. His complaint alleged that he had advised Hirsch and Joyce in implementing "a specific strategy" to solve their partnership problem and that "shortly after implementing the first step," Joyce had called him to report the success of the strategy and his optimism for a successful resolution. Joyce specifically denied these claims at the panel hearing, reiterating that respondent's "strategy" had gone nowhere and that he had told respondent so.

{¶ 14} Hirsch and Joyce ultimately hired another lawyer to resolve the partnership's troubles. They also had to engage a different lawyer to represent them in municipal court; that lawyer settled respondent's claim for $300. Hirsch and Joyce resigned themselves to the settlement because "[e]nough time and enough money had been spent and it was time to move on."

{¶ 15} During the panel hearing, respondent insisted that Hirsch and Joyce had orally agreed to pay him $5,000 for his services and that he had then followed up with a facsimile to commit the agreement to writing. We agree with the panel and board, however, and conclude that the evidence does not support respondent's claim that Hirsch and Joyce agreed to respondent's representation or his

fee. Moreover, respondent admitted at the hearing that he had spent no more than two hours of his time consulting with Hirsch and Joyce. Respondent thus must have realized that his claim for $5,000, representing a charge of $2,500 per hour for the suggestion that the partners negotiate, was excessive.

{¶ 16} In fact, respondent conceded during the hearing that he either should not have filed his lawsuit or should have asserted a claim for quantum meruit.[1] The panel and board therefore found that respondent attempted to collect fees clearly in excess of the value of his services from these two prospective clients. We agree and find that he thereby violated DR 2–106(A).

## B. Respondent Violated DR 7–102(A)(1) by Taking Legal Action Merely to Harass Another Person

{¶ 17} Respondent sued Hirsch and Joyce on his own behalf and testified why he did so. His demeanor and his explanation show that he filed the action to exact punishment for what he perceived to be an attempt to obtain free legal advice. Indeed, respondent's irritation with Hirsch and Joyce for supposedly trying to benefit, free of charge, from his experience and education is easily discernible from the pages of the transcribed record. As an example, this exchange took place during respondent's deposition, taken prior to the panel hearing:

{¶ 18} "[Relator's Counsel:] Well, do you think it is fair to sue somebody for $5,000 for an hour's worth of time? I am sorry. Two hours' worth of time?

{¶ 19} "[Respondent:] I am sure defense lawyers do it all the time. I would say yes. A breach of contract is a breach of contract. They got $5000 worth of advice, anyway. They were too ignorant to follow it.

{¶ 20} "[Relator's Counsel:] I thought you said earlier that you got a call from Mr. Joyce indicating that he—

{¶ 21} "[Respondent:] It went well. They got $5000 worth of advice. They paid nothing for it. I am glad they had problems. They deserve it. That is what shysters get for their dishonesty."

{¶ 22} From this evidence, the panel and board found that respondent had taken legal action for the sole purpose of harassing Hirsch and Joyce. We agree and find that he thereby violated DR 7–102(A)(1).

---

1. *"Quantum meruit* is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered." *Aultman Hosp. Assn. v. Community Mut. Ins. Co* (1989), 46 Ohio St.3d 51, 55, 544 N.E.2d 920.

*C. Respondent Engaged in Intimidation Tactics that Adversely Reflected on His Fitness to Practice Law in Violation of DR 1–102(A)(6) and that Violated Gov.Bar R. V(4)(G)*

{¶ 23} As a cautionary measure during prehearing proceedings, relator's counsel moved for a psychological examination to determine whether respondent suffered from a mental illness that substantially impaired his ability to practice law. See Gov.Bar R. V(7)(C)(1)(b). Though respondent ultimately complied when the panel chairwoman ordered an exam, at first he vigorously resisted the motion. After he unsuccessfully moved to strike, respondent moved to dismiss the complaint, to vacate the order for the exam, for the chairwoman's recusal, and for sanctions. He argued that a letter accompanying relator's motion for a psychological examination revealed damaging information about him and constituted an ex parte communication with the chairwoman. The motions were all denied.

{¶ 24} On April 12, 2007, respondent composed a letter to Disciplinary Counsel complaining about the purportedly improper communication between relator's counsel and the chairwoman. Ultimately, respondent chose not to send the April 12 letter to Disciplinary Counsel; however, he did send a copy of the letter to relator's counsel, creating the appearance that he had actually filed a grievance against counsel.

{¶ 25} Through the pretense of a sham grievance, respondent plainly aimed to intimidate relator's counsel and derail the disciplinary proceeding. Excerpts from respondent's deposition provide specific proof of this intent. At one point, relator's counsel asked why respondent had not attended a meeting during the disciplinary investigation, prompting this exchange:

{¶ 26} "[Respondent:] [Y]ou are not going to put words in my mouth. I am a lawyer. You are not smart enough to catch me doing something dishonest. I didn't do anything wrong here. You did.

{¶ 27} "[Relator's counsel:] Okay. Well, then, let's mark this as Exhibit A.

{¶ 28} "[Respondent:] And, believe me, a complaint is going to be filed against you."

{¶ 29} Later, respondent's deposition testimony left no doubt as to why he sent a copy of the April 12 letter to relator's counsel and then said nothing about not having actually filed the grievance:

{¶ 30} "[Relator's counsel:] Tell me when you think you should have these people sign this [notice-of-no-malpractice-insurance] form.

{¶ 31} "[Respondent:] I think I already explained that before. After I am engaged. That is what the DR provides. Do you have a problem understanding

that? Or is that not the answer you want? You want a convicting answer. Well, you are not going to get one.

{¶ 32} "[Relator's counsel:] Fair enough. I want the truth. That is what I want. Now—

{¶ 33} "[Respondent:] You want the truth? You have been hearing the truth. All you want is something to hang me with. It is so obvious. All right. I told you. After I am engaged. That is what the DR provides. Do you understand that? That is the truth. You can't handle the truth, can you? That is not what you are looking for.

{¶ 34} "[Relator's counsel:] You saw that movie, as well?

{¶ 35} "[Respondent:] Well, it applies here. You want something that you can complain to the Supreme Court about me for. Do it. Do whatever you want. *And I am coming after you personally.*" (Emphasis added.)

{¶ 36} From this evidence, the panel and board found that respondent had attempted to bully and intimidate his way out of the disciplinary process. We agree and find that he thereby violated Gov.Bar V(4)(G) and DR 1–102(A)(6).

## II. Sanction

{¶ 37} To determine the appropriate length of any attorney's suspension for professional misconduct, including any attendant conditions for a stay, we consider "the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Ake,* 111 Ohio St.3d 266, 2006-Ohio-5704, 855 N.E.2d 1206, ¶ 44. We weigh the aggravating and mitigating factors to decide whether circumstances warrant a more lenient or exacting disposition. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In deciding on a sanction, we are always mindful that the disciplinary process exists not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship and to allow us to ascertain the lawyer's fitness to practice law. *Disciplinary Counsel v. Agopian,* 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10, citing *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53, and *Ohio State Bar Assn. v. Weaver* (1975), 41 Ohio St.2d 97, 100, 70 O.O.2d 175, 322 N.E.2d 665.

### A. *Duties Violated, Injury, Mental State, and Case Law*

{¶ 38} In attempting to collect a clearly excessive fee from Hirsch and Joyce, respondent violated the legal profession's duty to charge fees in reasonable amounts. With his sham grievance against relator's counsel, respondent also

violated his duty to assist in the process that polices the legal profession. Hirsch and Joyce suffered from respondent's overbearing reaction to their decision not to hire him and their need to defend against his suit. And until the panel hearing, relator's counsel had no idea that respondent had not actually filed a grievance against him. Moreover, respondent's actions were meant to exact a toll from Hirsch, Joyce, and relator's counsel rather than to advance legitimate claims.

{¶ 39} As for comparable cases, neither respondent nor relator has cited case law for our consideration. It seems that while we have sanctioned lawyers for charging excessive fees, taking legal action merely to harass another, or attempting to intimidate disciplinary authorities, we have not had a case previously that presented all three improprieties. Sanctions imposed in similar cases are thus of little assistance in our review.

### B. *Aggravating and Mitigating Factors*

{¶ 40} Consistent with the board's report, we find as aggravating factors that respondent's misconduct manifested a selfish motive, showed an initial lack of cooperation in the disciplinary process, and caused actual harm to the victims. See BCGD Proc.Reg. 10(B)(1)(b), (e), and (h). Moreover, though respondent has since his deposition conceded that suing Hirsch and Joyce for $5,000 was wrong, he has remained staunchly committed to the notion that Hirsch and Joyce somehow took advantage of him, which does little to acknowledge wrongdoing. Respondent has also remained indignant toward the disciplinary process as a whole for checking his unethical conduct.

{¶ 41} Against these improprieties, only one factor weighs in respondent's favor—his lack of a prior disciplinary record. See BCGD Proc.Reg. 10(B)(2)(a). Respondent might have availed himself of BCGD Proc.Reg. 10(B)(2)(g), which affords mitigating effect upon proof that (1) a lawyer has been diagnosed with a mental disability or alcohol or drug dependency, (2) the disability or dependence contributed to cause the misconduct, (3) the disability or dependence has been successfully treated, and (4) the lawyer is currently able to practice law competently and within ethical boundaries. Respondent, however, vigorously denies any such disability or dependency.

{¶ 42} In fact, respondent has eschewed any attempt to prove the mitigating effect of a possible mental health or substance-abuse problem, completely defying the findings of the psychiatrist appointed to examine him. Respondent insists that he suffers from no psychological or other health deficiencies because (1) the psychiatrist reported no mental illness and (2) a therapist's report he submitted during prehearing proceedings supports that he is at low risk for having any dependency disorder.

{¶ 43} It is true that Samuel A. Nigro, M.D., concluded that respondent did not suffer from mental illness.[2] According to his August 2007 report, however, Dr. Nigro did find that respondent exhibited a maladaptive paranoid personality, and he suspected that this mental-health concern and possible alcohol abuse likely impede respondent's ability to practice law within acceptable standards. Though skeptical that respondent would do so, Dr. Nigro recommended that respondent be assessed further for potential problem areas and follow through with any recommended treatment plans.

{¶ 44} We have no conclusive evidence that a psychological or other mitigating condition contributed to cause respondent's misconduct. Respondent's lack of insight and combativeness toward Hirsch, Joyce, and relator's counsel, however, is not at all consistent with the reaction of a reasonable practitioner under the circumstances. Moreover, we are troubled that respondent has so strenuously resisted the possibility that his furious telephone call to Hirsch, the $5,000 lawsuit that he settled for $300, and his unwarranted threats to file a grievance are perhaps the result of disability or dependency.

## III. Conclusion

{¶ 45} The panel and board recommended a one-year suspension with six months stayed under the conditions that respondent (1) consult with the Ohio Lawyers Assistance Program ("OLAP"), enter into an OLAP contract to obtain whatever disability or dependency assistance he needs, and comply with all terms for the duration of the contract, and (2) complete a one-year probation under the supervision of a monitoring attorney, appointed by relator, to ensure compliance with ethical and professional standards of practice. These conditions appropriately require respondent to address any possible disability or dependency he has and subject his practice to the rigorous monitoring, reporting, and other probationary restrictions imposed by Gov.Bar R. V(9).

{¶ 46} We hereby suspend respondent's license to practice law in Ohio for one year; however, the last six months of the suspension are stayed on the recommended conditions, with the one-year probation to commence upon reinstatement following the conclusion of the six-month actual suspension. If respondent fails to comply with the terms of the stay, the stay will be lifted, and respondent shall serve the entire one-year suspension. Costs, including those for the psychologi-

---

2. Mental illness generally connotes a condition more debilitating than a mental-disability diagnosis under BCGD Proc.Reg. 10(B)(2)(g). Under Gov.Bar R. V(7)(A), "mental illness" has the same meaning as the definition in R.C. 5122.01(A)—"a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

cal examination performed in the public interest pursuant to Gov.Bar R. V(7)(C)(1)(b), are taxed to respondent.

Judgment accordingly.

Pfeifer, O'Connor, Lanzinger, and Cupp, JJ., concur.

Lundberg Stratton and O'Donnell, JJ., dissent.

---

**O'Donnell, J., dissenting.**

{¶ 47} I respectfully dissent from the majority's decision. The board recommended that we suspend respondent's license for one year and stay the last six months on conditions. The majority accepts the board's findings of misconduct and its recommendation for a one-year suspension with the last six months stayed on conditions. I disagree with this decision because Jeffrey A. Catanzarite has practiced law for 28 years without any prior infractions and because this matter arises out of a simple miscommunication regarding attorney fees. In my view, a suspension from the practice of law is unwarranted.

{¶ 48} A panel of the board found several aggravating factors present in this case, including findings that respondent possessed a dishonest and selfish motive, failed to cooperate in the disciplinary process, and refused to acknowledge the wrongful nature of his conduct. The panel also found as mitigation, however, respondent's lack of prior disciplinary offenses.

{¶ 49} That a fee dispute sparked the Hirsch–Joyce grievance is clear. When respondent first spoke with Hirsch, he offered Hirsch a free consultation. Respondent claimed that he meant that he would not charge for the initial telephone conversation. Hirsch and Joyce understood his offer differently. They both thought, perhaps due to inexperience with retaining counsel, that their first face-to-face meeting with respondent would be free. From this basic miscommunication came respondent's furious telephone call to Hirsch, the $5,000 lawsuit that he settled for $300, and his unwarranted threats to file a grievance against relator's counsel.

{¶ 50} We have no conclusive evidence that a psychological or other mitigating condition contributed to cause respondent's misconduct. His lack of insight and combativeness toward Hirsch, Joyce, and relator's counsel, however, are not consistent with the reaction of a reasonable practitioner under the circumstances. On the other hand, respondent has enjoyed a long and unblemished career in law, and this weighs heavily in his favor. Moreover, respondent personally promised during oral argument that if ordered to do so, he would obtain a more decisive diagnosis as to any possible disability or dependency and follow up with any recommended treatment.

{¶ 51} The panel and board recommended that respondent (1) consult with the Ohio Lawyers Assistance Program ("OLAP"), enter into an OLAP contract to obtain whatever disability or dependency assistance he needs, and comply with all terms for the duration of the contract, and (2) complete a one-year probation under the supervision of a monitoring attorney, appointed by relator, to ensure compliance with ethical and professional standards of practice. These conditions appropriately require respondent to address any possible disability or dependency he has and subject his practice to the rigorous monitoring, reporting, and other probationary restrictions imposed by Gov.Bar R. V(9).

{¶ 52} Based on the foregoing, I would suspend respondent's license to practice law in Ohio for one year but stay the suspension on the recommended conditions. If respondent would fail to comply with the terms of the stay, the stay would be lifted, and respondent would serve the entire one-year suspension.

{¶ 53} I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

———————

Alfred E. Schrader, Patricia A. Vance, and David M. Lowry, for relator.

Jeffrey A. Catanzarite, pro se.