TOLEDO BAR ASSOCIATION *v.* HALES.

[Cite as *Toledo Bar Assn. v. Hales,* 120 Ohio St.3d 340, 2008-Ohio-6201.]

(No. 2008–0819—Submitted July 22, 2008—Decided December 4, 2008.)

———————————

**Per Curiam.**

{¶ 1} We must decide in this case the appropriate sanction for a lawyer who (1) mishandled and consequently lost a client's case because of his inexperience, (2) failed to notify his insurance carrier of the client's legal-malpractice claim against him, prompting the insurer to deny coverage, and (3) declared bankruptcy, preventing his client from collecting on the legal-malpractice judgment that she obtained. Finding that these acts violated the Code of Professional Responsibility, the Board of Commissioners on Grievances and Discipline recommends that

we suspend the lawyer's license for two years and stay the last year on conditions, including monitored probation of his practice. We accept the board's findings of misconduct; however, because a shorter period of actual suspension and a longer monitored probation will provide more remedial instruction to the lawyer without undue risk to the public, we order a two-year suspension and conditionally stay the last 18 months.

{¶ 2} Respondent, Steven C. Hales of Toledo, Ohio, Attorney Registration No. 0071285, was admitted to the practice of law in Ohio in 1999. Relator, Toledo Bar Association, charged respondent in a two-count complaint with five Disciplinary Rule violations, all for ethical breaches toward a single client. A panel of the board heard the case, including the parties' extensive stipulations, found the charged misconduct, and recommended a two-year suspension with 18 months stayed under conditions, including monitored probation. The board adopted the panel's findings of misconduct, but recommended the two-year suspension with a conditional stay of only the last year.

{¶ 3} Respondent concedes his misconduct, but objects to the board's recommended sanction. He insists that the board weighed against him nonexistent aggravating factors, mainly misinterpreting his embarrassment for lack of remorse. Respondent claims that the board's recommended sanction is too severe, given the mitigating evidence and the fact that his violations resulted from his making honest mistakes at a time when he was a recent admittee to the bar. We accept that respondent acted out of inexperience rather than ill-will; however, to ensure that he does not do so again, we order a two-year suspension and stay the last 18 months on conditions of monitored probation and no further misconduct.

## I. Misconduct

{¶ 4} While working as a project manager in the commercial-credit division of a large corporation, respondent went to law school, graduated, and, at 39 years old, passed the Ohio bar exam. He then worked for two and a half years with a law firm that handled insurance defense and subrogation claims, but he had only minor responsibilities. In 2002, he entered into an office-sharing arrangement with the law firm of Lydy and Moan, L.L.C., and started a general litigation practice while also accepting a few bankruptcy cases. In October 2004, respondent stopped sharing office space with Lydy and Moan.

### A. Respondent's Mishandling of the Oehlers Case

{¶ 5} Respondent met Bonnie Oehlers in August 2003 through his son's friendship with her daughter. At the time, Oehlers was pursuing a medical-malpractice action against multiple defendants for negligence in the postoperative care that she alleged had led to her mother's death. John B. Fisher, an experienced practitioner in medical malpractice, had already worked extensively

on the case. In anticipation of trial, Fisher had obtained experts to testify against all defendants except the named nursing home, taken multiple depositions, advanced approximately $10,000 in expenses, and negotiated a high-low settlement agreement with the nursing home.

{¶ 6} Oehlers asked respondent to review the high-low settlement agreement before she signed it. The agreement guaranteed the nursing home's immediate payment to Oehlers of $30,000 and provided for a possible additional payment to her of up to $30,000, depending on the outcome of the litigation. Respondent discussed the agreement, Oehlers's malpractice complaint, and a nurse practitioner's evaluation of the decedent's medical records with Jeffrey Lydy of Lydy and Moan.

{¶ 7} Respondent later told Oehlers that the nursing home should be willing to pay more than the amounts specified in the high-low settlement agreement. Oehlers took respondent's advice not to sign the agreement and decided to hire him; she then retrieved her files from Fisher's office and gave them to respondent. Respondent had never litigated a medical-malpractice claim before, and upon accepting Oehlers's case, asked Lydy to serve as co-counsel. Lydy declined, but offered to help respondent with any advice he needed.

{¶ 8} Respondent entered an appearance in the Oehlers case in mid-September 2003, and Fisher withdrew as counsel. Respondent could find no experienced lawyer to share responsibility for pursuing Oehlers's claim, and in the months after entering an appearance as counsel, he did not conduct any discovery. The trial court's pretrial order set a deadline of late December 2003 for plaintiff to disclose her expert witnesses, but respondent did not file notice of his expert witnesses on time.

{¶ 9} In February 2004, the nursing home moved for summary judgment, arguing that respondent had failed to disclose the expert witnesses who were necessary to sustain the plaintiff's burden of proving that defendants' negligent medical care had caused the decedent's death. By the end of March 2004, all other defendants had similarly moved for summary judgment. Respondent filed three successive motions to extend the deadline for his response to these motions, all of which were granted, giving him until May 15, 2004, to file his response in opposition.

{¶ 10} In the meantime, respondent had asked Fisher for the names of the experts that Fisher had anticipated using to prove the defendants' liability. Fisher, who had claimed a lien for the value of his work and expenses in the case, provided the names of two doctors. Fisher had planned to call a director of a surgical critical-care unit to establish defendants' breaches of the applicable standards of care and a pathologist to testify to causation. But because the

director had recently retired, Fisher also warned respondent that this doctor no longer qualified as an expert under evidentiary rules.

{¶ 11} Respondent was not able to obtain an expert to testify against the nursing home, nor was he able to find a replacement expert for the retired doctor. Respondent explained to the hearing panel that neither he nor his client had had the money to pay doctors to review the medical evidence necessary to render an expert opinion. Respondent did, however, advance somewhere between $600 and $1,000 to obtain an affidavit from the pathologist regarding causation and standard of care, which he filed with his response to the motions for summary judgment.

{¶ 12} Respondent responded to all the motions for summary judgment in one filing on May 25, 2004, ten days after the extended deadline. In July 2004, the trial court granted summary judgment in favor of all defendants. The court determined that respondent's expert lacked the qualifications to testify to the various standards of care at issue and that the plaintiff therefore could not sustain her burden of proof.

{¶ 13} Respondent advised Oehlers of the court's ruling and then tried to arrange a meeting with her and Fisher to explore Oehlers's options. He never scheduled the meeting or spoke to Oehlers about the malpractice case again. Respondent told the hearing panel that Oehlers later called him to discuss a different legal matter, and he understood her call to mean that "she had put [the] whole entire episode to bed."

### B. Respondent's Bankruptcy Case

{¶ 14} In February 2005, respondent filed a Chapter 7 bankruptcy petition for discharge of his personal debts. He did not list the possibility of a lawsuit by Oehlers for his legal malpractice, but because the bankruptcy court treated the filing as a "no-asset" case, the failure to list did not prevent the discharge of the debt. See *In re Madaj* (C.A.6, 1998), 149 F.3d 467.[1] The bankruptcy court granted respondent a discharge of all indebtedness in mid-May 2005.

---

1. According to *In re Talon Automotive Group, Inc.* (Bankr.E.D.Mich.2002), 284 B.R. 622, fn. 1, the Sixth Circuit held in *In re Madaj* that the exception to discharge under [Section 523(a)(3)(A), Title 11, U.S.Code] for unlisted debts "does not apply to debts in a chapter 7 no-asset case. Section 523(a)(3)(A) excepts from discharge debts 'neither listed nor scheduled * * * in time to permit * * * timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing.' *Id.* [149 F.3d] at 469. The court stated that in a chapter 7 no-asset case, there is typically no deadline for filing a proof of claim, and that therefore, 'there is no date by which a proof of claim must be filed in order to be "timely" and whenever the creditor receives notice or acquires actual knowledge of the bankruptcy, he may file a proof of claim, [and that claim will be timely.]' *Id.* The court further explained that '[b]ecause § 523(a)(3)(A) excepts the unscheduled debt from discharge "unless such creditor had notice or actual knowledge of the case in time for such timely filing," the moment the creditor receives notice or knowledge of the

{¶ 15} Oehlers sued respondent for malpractice in June 2005. After the certified mail containing the complaint had been returned "unclaimed," Oehlers served respondent with notice of her suit by regular mail. Respondent at some point also filed for Chapter 13 bankruptcy protection after defaulting on his mortgage. He accurately listed Oehlers's malpractice claim in his petition as a pending action.

{¶ 16} Respondent did not file an answer in the legal-malpractice action, and after the bankruptcy court granted Oehlers relief from the automatic stay, the common pleas judge granted her motion for default judgment. The court later awarded Oehlers $280,000 in damages. Respondent had malpractice insurance, but because he never gave his insurer notice of Oehlers's pending malpractice claim, his carrier denied coverage. Oehlers has not been able to recover from respondent because of the discharge in bankruptcy, and she is unable to recover from his insurer because respondent's failure to disclose her claim removed the insurer's liability.

{¶ 17} The parties stipulated that respondent's discharge in bankruptcy did not release his insurer from liability, but respondent did not realize this fact at the time. Respondent testified that he thought his Chapter 7 discharge wiped out even his insurer's contractual obligation to indemnify others for losses caused by his professional negligence.

## C.   Disciplinary–Rule Violations

{¶ 18} Respondent lacked the experience necessary to competently litigate Oehlers's medical-malpractice case and failed to obtain sufficient assistance from another lawyer who had this expertise. He then ignored his duty to disclose Oehlers's legal-malpractice claim to his insurer and filed bankruptcy, leaving his client with an uncollectible $280,000 judgment against him. Respondent thereby violated DR 1–102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law), 6–101(A)(1) (prohibiting a lawyer from handling a legal matter that the lawyer knows or should know he lacks competence to handle and without associating with a lawyer who has that competence), 6–101(A)(2) (prohibiting a lawyer from handling a legal matter without preparation adequate under the circumstances), 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter), and 7–101(A)(3) (prohibiting a lawyer from intentionally causing a client prejudice or damage during a professional relationship).

---

bankruptcy case, § 523(a)(3)(A) ceases to provide the basis for an exception from discharge. Consequently, the debt is at that point discharged.' *Id.* at 470."

## II. Sanction

{¶ 19} When imposing sanctions for attorney misconduct, we consider relevant factors, including the duties the respondent breached and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. "[W]e also weigh evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ('BCGD Proc.Reg.'). *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993." *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B).

### A. Duties Respondent Breached and Sanctions Imposed in Similar Cases

{¶ 20} We have already discussed respondent's breaches of the duties he owed to his client and the legal profession. As for sanctions in similar cases, the panel and board referred to cases from other jurisdictions, all authorizing disciplinary sanctions for a lawyer's refusal to pay judgment debts or settlement obligations. See, e.g., *In re Disciplinary Action Against Ruffenach* (Minn.1992), 486 N.W.2d 387 (lawyer's license suspended for a minimum of 90 days because he intentionally underreported his income on financial-disclosure forms and failed to pay a malpractice judgment for three and a half years); *In re Disciplinary Action Against Pokorny* (Minn.1990), 453 N.W.2d 345 (lawyer's license indefinitely suspended, with reinstatement subject to conditions, because he missed three court appearances, failed to pay court fees assessed for his unjustified absences, and failed to pay two judgments for law-office expenses); *In re Disciplinary Action Against Stanbury* (Minn.1997), 561 N.W.2d 507 (lawyer publicly reprimanded and suspended for 30 days, with reinstatement subject to conditions, because he refused to pay law library's judgment against him and stopped payment on a personal check, refusing to pay a court filing fee), and *Lawyer Disciplinary Bd. v. Swisher* (1998), 203 W.Va. 603, 509 S.E.2d 884 (lawyer's license suspended until he satisfied ordered conditions because he agreed to settle a legal-malpractice claim and then intentionally did not pay an overdue $15,000 installment for four years).

{¶ 21} We agree with the panel and board that a period of actual suspension is warranted for respondent's wrongdoing. In crafting the sanction in this case, we keep in mind that the goal of disciplinary proceedings is not to punish the errant lawyer, but to protect the public. *Akron Bar Assn. v. Catanzarite*, 119 Ohio St.3d 313, 2008-Ohio-4063, 893 N.E.2d 835, ¶ 37. While consistency is also a goal, "we examine each case individually and impose the discipline we believe appropri-

ate based on the unique circumstances of each case." *Ruffenach*, 486 N.W.2d 387, 390.

## B. Mitigating and Aggravating Factors

{¶ 22} Respondent has no prior disciplinary record of misconduct and fully admitted his wrongdoing by stipulating to his misconduct and cooperating in the disciplinary proceedings. BCGD Proc.Reg. 10(B)(2)(a) and (d). Respondent also presented evidence of his good character and reputation apart from the underlying misconduct, a mitigating factor under BCGD Proc.Reg. 10(B)(2)(e). Three lawyers testified about respondent's professionalism and competence relative to his experience, and two others wrote letters echoing that opinion.

{¶ 23} In addition, respondent testified about the personal embarrassment this grievance has caused him, but his testimony also showed, as the panel and board found, little concern for either his client's or Fisher's losses. Respondent has attempted to rectify some of the circumstances in his practice that led to his Disciplinary Rule violations. He has hired a secretary, now uses the Ohio State Bar Association Client Keeper office-management materials, and does not accept cases that may require preparation beyond his ability or litigation costs of over $5,000 or $6,000. Respondent nevertheless needs temporary oversight to ensure that he practices within ethical standards.

{¶ 24} Aggravating factors weighing against respondent include that he acted out of self-interest, harmed a vulnerable client, and failed to make restitution. BCGD Proc.Reg. 10(B)(1)(b), (h), and (i). The board, in adopting the panel's report, expressed a particular desire to hold respondent accountable despite the discharge in bankruptcy of his indebtedness to Oehlers, citing *Hippard v. State Bar of California* (1989), 49 Cal.3d 1084, 264 Cal.Rptr. 684, 782 P.2d 1140. *Hippard* represents one of a number of courts in other jurisdictions that have ordered restitution to a client as a condition of a disciplined attorney's reinstatement to practice, notwithstanding a discharge in bankruptcy of the underlying debt. See also *People v. Huntzinger* (Colo.1998), 967 P.2d 160, and *In re Bradley* (C.A.5, 1993), 989 F.2d 802, 804.

{¶ 25} But as the board and panel acknowledged, Ohio has taken the opposing view. In *Cleveland Bar Assn. v. Gay* (2002), 94 Ohio St.3d 404, 763 N.E.2d 585, we found that a lawyer had qualified for reinstatement after an indefinite suspension, notwithstanding that a bankruptcy court had discharged the $50,000 malpractice judgment we had ordered him to pay as restitution. We excused the lawyer's compliance with our order because of Section 525(a), Title 11, U.S.Code, which prohibits a governmental unit from refusing to renew a license or other similar grant for the reason that the applicant has sought bankruptcy protection or has not paid a debt that was discharged. Id. at 405, 763 N.E.2d 585. Accord *Dayton Bar Assn. v. Gerren*, 110 Ohio St.3d 297, 2006-Ohio-4482, 853 N.E.2d 302.

### C. Conclusion

{¶ 26} Ordering respondent to pay restitution would further respondent's rehabilitation, *Gerren* at ¶ 23, but following *Gay*, we do not order it here. To safeguard the public and deter other unseasoned lawyers from unsupervised practice in areas in which they have insufficient legal expertise, we suspend respondent from the practice of law in Ohio for two years and order a stay of the last 18 months on the condition that respondent complete an 18-month probation, monitored by an attorney appointed by relator pursuant to Gov.Bar R. V(9). During the probation, respondent shall, in addition to the other requirements of that rule, accept only cases within his experience level or arrange for competent co-counsel. If respondent fails to comply with these terms, the stay will be lifted, and respondent will serve the entire two-year suspension.

{¶ 27} Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, O'DONNELL, and CUPP, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

MOYER, C.J., and O'CONNOR and LANZINGER, JJ., dissent.

---

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 28} I agree with the majority's holding, except that I would also require Hales to pay $280,000 in restitution as a condition precedent to reinstating his law license. Therefore, I respectfully dissent in part.

{¶ 29} The majority states that "[o]rdering respondent to pay restitution would further respondent's rehabilitation." Majority opinion at ¶ 26. Nevertheless, following *Cleveland Bar Assn. v. Gay* (2002), 94 Ohio St.3d 404, 763 N.E.2d 585, the majority holds that the respondent is not required to pay restitution as a condition of reinstatement.

{¶ 30} In *Gay*, the court considered whether attorney James Gay, who had been indefinitely suspended, should be reinstated to the bar. One of the conditions of Gay's reinstatement was that he prove that he had paid restitution, which included a $50,000 malpractice judgment in favor of Johnnie Jones, one of Gay's former clients. Id. at 585–586, 763 N.E.2d 585. On the morning of his reinstatement hearing, Gay filed bankruptcy, and the bankruptcy court later discharged the malpractice judgment. Id. at 404–405, 763 N.E.2d 585.

{¶ 31} We had to determine whether Gay was still required to pay the $50,000 in restitution in light of the bankruptcy court's discharge of the underlying malpractice judgment. With no independent analysis of the statute, we accepted

the board's determination that Section 525(a), Title 11, U.S.Code, prevented us from requiring Gay to pay restitution as a condition of reinstatement to the bar. *Gay,* 94 Ohio St.3d at 405–406, 763 N.E.2d 585. I dissented in *Gay* because I believed that Section 525(a) did not prevent the court from imposing restitution as a condition of our reinstatement of Gay's law license. Id. at 406–407, 763 N.E.2d 585. I continue to embrace that position.[2]

{¶ 32} Section 525(a) provides:

{¶ 33} "[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, *solely because* such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act." (Emphasis added.)

{¶ 34} This provision prevents a government entity from denying the reinstatement of a license solely because the applicant has been a bankruptcy debtor. But we impose restitution in disciplinary cases to rehabilitate the disciplined attorneys and to protect the public. I do not believe Section 525(a), Title 11, U.S.Code, prevents this court from enforcing restitution as a condition of reinstatement to the bar.

{¶ 35} "[T]he disciplinary process exists not to punish the offender but to protect the public." *Akron Bar Assn. v. Catanzarite,* 119 Ohio St.3d 313, 2008-Ohio-4063, 893 N.E.2d 835, ¶ 37, citing *Disciplinary Counsel v. Agopian,* 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10, citing *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53, and *Ohio State Bar Assn. v. Weaver* (1975), 41 Ohio St.2d 97, 100, 70 O.O.2d 175, 322 N.E.2d 665. We have also recognized that rehabilitating disciplined lawyers is another goal of the disciplinary process. See *Ohio State Bar Assn. v. Johnson,* 96 Ohio St.3d 192, 2002-Ohio-3998, 772 N.E.2d 1184, ¶ 7.

---

2. In *Dayton Bar Assn. v. Gerren,* 110 Ohio St.3d 297, 2006-Ohio-4482, 853 N.E.2d 302, this court applied *Gay,* 94 Ohio St.3d 404, 763 N.E.2d 585, in holding that an attorney would not have to pay restitution as a condition of having his law license reinstated if he discharged the underlying debt in bankruptcy. Although I joined the majority in *Gerren* in applying *Gay* as the law of the case, I believe we need to revisit *Gay* because it interprets Section 525(a), Title 11, U.S.Code too broadly.

{¶ 36} "Restitution is often made a condition of reinstatement to the practice of law * * *." *Dayton Bar Assn. v. Gerren,* 110 Ohio St.3d 297, 2006-Ohio-4482, 853 N.E.2d 302, ¶ 23. "It is part of the rehabilitation process and a goal of rehabilitation. See *People v. Huntzinger* (Colo.1998), 967 P.2d 160; *In re Levine* (1993), 174 Ariz. 146, 176, 847 P.2d 1093, 1123, [fn. 21] (the Supreme Court of Arizona imposed a postdischarge disciplinary sanction of restitution as a term of probation because the restitution was part of the rehabilitative process of the disciplinary proceeding); *People v. Sullivan* (Colo.1990), 802 P.2d 1091; *Brookman v. State Bar of California* (1988), 46 Cal.3d 1004, 251 Cal.Rptr. 495, 760 P.2d 1023." *Gay,* 94 Ohio St.3d at 407, 763 N.E.2d 585 (Lundberg Stratton J., dissenting).

{¶ 37} The California Supreme Court has held that "Section 525(a) of the Bankruptcy Act precludes suspension of a license to practice law 'solely because' an attorney has failed to pay a debt that was discharged in bankruptcy, but it does not preclude suspension for professional misconduct that happened to culminate in the attorney's bankruptcy. Nor, contrary to petitioner's position, does section 525(a) appear to preclude restitution ordered as a condition of properly imposed suspension and probation. Such restitution is not imposed 'solely because' the attorney has failed to pay a debt discharged in bankruptcy; instead, it is imposed in order to protect the public and to help rehabilitate the State Bar member." *Brookman v. State Bar of California,* 46 Cal.3d 1004, 1008, 251 Cal.Rptr. 495, 760 P.2d 1023. The court in *Brookman* ultimately concluded that "nothing in the Bankruptcy Act, or the cases interpreting that act, prevents imposition of restitution as a condition of probation in an attorney disciplinary matter—even if the underlying subject of the restitution has previously been discharged in bankruptcy, and thus cannot be collected as a debt as such." Id. at 1009, 251 Cal.Rptr. 495, 760 P.2d 1023; see also *Hippard v. State Bar of California* (1989), 49 Cal.3d 1084, 1093, 264 Cal.Rptr. 684, 782 P.2d 1140 (requiring restitution as a condition of reinstatement of law license was proper despite discharge of underlying debt in bankruptcy).

{¶ 38} Consistent with the reasoning of the California Supreme Court in *Brookman* and *Hippard,* I believe that Section 525(a), Title 11, U.S.Code does not prevent the court from requiring the attorney to pay restitution as a condition of reinstating the attorney's law license, even when the attorney has discharged the underlying debt through bankruptcy. The majority opinion permits suspended attorneys to escape rehabilitation merely by filing bankruptcy, which harms the public and is contrary to a plain reading of Section 525(a).

{¶ 39} Therefore, I would require Hales to pay $280,000 in restitution as part of his sanction. Accordingly, I respectfully dissent in part.

MOYER, C.J., dissenting.

{¶ 40} I respectfully dissent from the majority's opinion with regard to the sanction imposed on respondent.

{¶ 41} Respondent's conduct throughout the representation of Bonnie Oehlers shows that he was concerned chiefly with his own interests and not those of his client. Respondent took on this case after a conversation with Oehlers, the mother of one of his son's friends. On respondent's advice, Oehlers rejected a settlement offer on a medical-malpractice claim, which had been arranged by Oehlers's prior attorney. She then released the prior attorney and hired respondent. However, respondent lacked the experience to represent Oehlers and failed to obtain assistance. Ultimately, Oehlers lost her case on summary judgment because respondent was unable to secure necessary expert witnesses.

{¶ 42} Further, Oehlers has been unable to collect any of the $280,000 in damages for malpractice that she was awarded against respondent, because of his bankruptcy filings and failure to report the claim to his malpractice insurance carrier.

{¶ 43} These self-interested ethical violations warrant a stricter sanction than that ordered by the majority. I would therefore adopt the sanction recommended by the board: a two-year suspension from the practice of law, with one year stayed on conditions, including monitored probation of his practice.

O'CONNOR and LANZINGER, JJ., concur in the foregoing opinion.

---

Jonathan B. Cherry, Bar Counsel; Gregory L. Arnold; and Spengler Nathanson, P.L.L., and James P. Silk Jr., for relator.

George Gernot III, for respondent.