Kennedy, J., dissenting.
{¶ 40} Because the majority fails to give sufficient weight to the mitigating factors that respondent, Harlan Daniel Karp, presented in this case, including his mental and physical disorders that contributed to cause his misconduct, I dissent from its decision to suspend him from the practice of law for two years with 18 months of the suspension stayed on conditions. As relator, disciplinary counsel, has recognized, the acts of misconduct in this case "are 'blips' in an otherwise nearly 30-year admirable career" that is marked by "ample evidence of good character and reputation outside of the charged misconduct."
*228 {¶ 41} Contrary to the majority's conclusion, Karp established through expert testimony a sustained period of successful treatment of his depression and hypothyroidism, which mitigates his misconduct. Accordingly, the appropriate sanction to protect the public from further misconduct is a two-year suspension, with the entire suspension stayed on conditions-including entering into a contract with the Ohio Lawyers Assistance Program ("OLAP") and complying with his OLAP contract and the recommendations of his treating healthcare professionals.
{¶ 42} The facts of this case are largely uncontested. Veronika Gadzheva, a Bulgarian ballroom dancer, entered the United States in May 2015 with an O-1B visa that expired in February 2018. Dissatisfied with her employer in New Jersey, Gadzheva received an offer to work for Patricia West at her dance studio in California. In July 2015, Gadzheva contacted Karp to obtain his assistance in transferring her O-1B visa to West's studio and Karp accepted the case. Although Karp told Gadzheva that filing the I-129 petition "could take a week," it took Karp approximately eight months to file it with the government. During that time, Karp falsely informed Gadzheva and West on numerous occasions that he had filed the petition when he had not, and he failed to comply with their frequent requests for proof that it had been filed. When Karp finally filed the petition in April 2016, he signed West's name without her authority.
{¶ 43} In the meantime, Gadzheva's original petition was revoked by the government after she stopped working for the employer who had initially sponsored her visa. This meant that Gadzheva might have lived and worked in the United States without authorization, which could render her inadmissible to the United States for as long as ten years. Gadzheva had to retain a new attorney to file a new I-129 petition on her behalf, and the government granted her a new O-1B visa. However, because Gadzheva's original I-129 petition had been revoked, her immigration status had not been valid when counsel filed the most recent petition, and Gadzheva would have to leave the United States in order to activate her new O-1B status. Gadzheva was afraid to return to Bulgaria to activate the visa without knowing whether her unauthorized stay would preclude readmission to the United States.
{¶ 44} In July 2016, Gadzheva filed a grievance against Karp, and in response to relator's first letter of inquiry, Karp admitted that he had not submitted the petition *829 in a timely manner and that he had misled Gadzheva and West into believing that he had. He also told relator that he had had authority to file the petition on behalf of West's dance studio, and he enclosed an unsigned copy of the I-129 petition that he said he filed on Gadzheva's behalf. However, on further inquiry from relator, Karp falsely stated that he had signed West's name with her authority and provided what he purported to be a copy of the actual petition that *229 he had filed on Gadzheva's behalf-this time with West's signature and the notation "per authority" next to the signature. But this was not a true copy of the petition that Karp had submitted to the government.
{¶ 45} It is undisputed that Karp's conduct fell short of the professional standards demanded of all attorneys. At issue here is what sanction is necessary to protect the public from future misconduct. See Toledo Bar Assn. v. Hales , 120 Ohio St.3d 340, 2008-Ohio-6201, 899 N.E.2d 130, ¶ 21. When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases. Id. at ¶ 19.
{¶ 46} The parties recommend a two-year suspension, all stayed on conditions. The majority, however, adopts the board's recommendation of a two-year suspension, with only the last 18 months stayed. In my view, the majority fails to properly weigh the aggravating and mitigating factors, and we ought to adopt the recommendation of the parties.
{¶ 47} Significantly, the majority discounts the mitigating effect of Karp's mental disorder. Gov.Bar R. V(13)(C)(7) provides that a mental disorder may be a mitigating factor when all the following are shown: (1) a diagnosis by a qualified healthcare professional, (2) a determination that the disorder contributed to the cause of the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified healthcare professional that the attorney will be able to return to the competent and ethical professional practice of law. The majority agrees that Karp has been diagnosed with major depressive disorder and hypothyroidism, that these disorders contributed to cause his misconduct, and that Karp has presented a prognosis that he is capable of competently and ethically practicing law. The majority, however, asserts that "it is not entirely clear from the record that Karp has achieved the sustained period of successful treatment necessary for his mental disorder to qualify for maximum mitigating effect under Gov.Bar R. V(13)(C)(7)(c)." (Emphasis sic.) Majority opinion at ¶ 32.
{¶ 48} To interpret a rule promulgated by this court, we apply general principles of statutory construction. Erwin v. Bryan , 125 Ohio St.3d 519, 2010-Ohio-2202, 929 N.E.2d 1019, ¶ 22. Consequently, we must read undefined words or phrases in context and then construe them according to rules of grammar and common usage. Id. "If a court rule is unambiguous, we apply it as written." Id.
{¶ 49} The Rules for the Government of the Bar do not define the phrase "sustained period of successful treatment." Gov.Bar R. V(35)(A) through (M). The word "sustained" means "maintained at length without interruption, weakening, or losing in power or quality: PROLONGED, UNFLAGGING." (Capitalization sic.) Webster's Third New International Dictionary 2304 (2002). "Successful" means "gaining or having gained success," with "success" meaning "the degree *230 or measure of attaining a desired end." (Emphasis added.) Id. at 2282. "Treatment" is defined *830 as "the action or manner of treating a patient medically or surgically," and to "treat" someone is "to seek cure or relief of (as a disease)." Id. at 2435. "Treatment" is not synonymous with "cured."
{¶ 50} That the rule requires only an uninterrupted period of gaining success in seeking a cure of, or relief from, a disorder is important. Due to the limited amount of time to seek treatment between the filing of the grievance and the disciplinary hearing, the rule contemplates that the attorney will not necessarily be cured of the mental disorder or that the disorder will not necessarily be in remission before the date of the hearing. Rather, the point of the rule is to ensure that the attorney has begun and maintained the course of treatment prescribed by his or her qualified healthcare professional, not that the attorney must prove that he or she is cured.
{¶ 51} Karp began treatment for his depression with prescribed medication in March 2017 and started psychotherapy three months later. Sherif Soliman, M.D., evaluated Karp in September 2017 and reported, "[W]hen I saw [Karp] in September his depression was improving. He had had more energy, better concentration, improved mood and was losing weight, which was significant because one of his manifestations of depression was that he was overeating and gaining weight." Dr. Soliman recommended increasing the dosage of the antidepressant medication and that Karp talk to his general physician to discuss treating his hypothyroidism, and when he reassessed Karp in November 2017, Dr. Soliman noted a "marked improvement. And, in fact, the rate of improvement accelerated significantly in that from when I saw him in September he was a bit better than he had been before, but when I saw him in November he was markedly better. He said that he had a lot more energy, he no longer felt depressed, his concentration was better, and he was-his sleep had normalized." Dr. Soliman continued:
[Karp's] depression was essentially in remission; although I use that term a bit cautiously because under DSM to be classified as being in remission you need two months of not meeting criteria for major depression. So he was right at that line of two months. Close to it. But he was no longer feeling depressed. As I mentioned early [sic.], his concentration was better, energy was better, sleep pattern was better. He was continuing to lose weight, which was a very positive thing.
So again, fairly substantial improvement between September and November.
*231 {¶ 52} The majority contends that Karp did not establish a sustained period of successful treatment because Dr. Soliman's September 2017 report indicated that Karp had experienced "a period of sustained treatment with some success " and Dr. Soliman also testified that Karp was not technically in remission as of his last assessment in November 2017. (Emphasis sic.) Majority opinion at ¶ 31. But to be successful, Karp did not have to be cured of his depression, nor did it have to be in remission. Rather, successful means gaining success, and treatment is the manner of seeking a cure or relief from a disorder. And here, the evidence demonstrates that for a period of approximately nine months, Karp had been gaining success in his battle with depression, showing improvement over a sustained period of time.
{¶ 53} The board, in contrast to the majority, based its recommendation of an actual suspension on finding that Karp had made "multiple misrepresentations to his *831 client, his client's employer, the United States government, and to the Relator" and that "these misrepresentations have very serious consequences." While I recognize that making misrepresentations to a client is serious misconduct, Karp's misrepresentations must be considered within the context of his mental and physical disorders.
{¶ 54} Dr. Soliman testified about the association between depression and impaired executive functioning and the inability to plan and weigh the consequences of potential courses of action. He pointed out that individuals with depression may "simply take the path of least resistance" and that "symptoms of anxiety and panic are highly common in individuals with depression. * * * Something comes at them that they don't think they can handle and they become panicked and really fail to consider fully what courses of action are open to them."
{¶ 55} Dr. Soliman further explained that depression is not a "categorical disability"; that is, "on a good day you might not even be able to tell they are depressed, but on a bad day they might not be able to get out of the bed. * * * They might do fine with a routine task, but then have more difficulty with something challenging." He continued:
For example, if somebody sees a nicely laid out file, as an attorney they might be able to handle the case with no problem. But if they have several different files that they need to organize or several different attachments they need to look at they may becoming [sic] frustrated and not be able to attend to that more complex or more frustrating, for lack of a better word, task. * * *
* * * [T]he presence of the depression may make it more difficult for him to tackle that complicated file. So somebody who is not depressed may *232 say all right, I need to first organize this file and then divide the tasks up into the necessary steps; whereas somebody who is depressed may say well, I'll just deal with it later, set it to the side and then go onto something else.
{¶ 56} Here, Gadzheva e-mailed Karp approximately 500 pages of documents, but "he couldn't concentrate on organizing the multiple documents provided by the client which * * * were provided as jpeg files, which is a photo format as opposed to a document format. So essentially that would mean that the pages are individual picture files." As Dr. Soliman understood the situation, each page of the documents had to be separately opened, printed, and numerically ordered. Given Karp's poor concentration-a symptom of depression-he was not able to complete this task. And when Gadzheva contacted him about the status of the petition, he misrepresented that it had been filed "so that [he] could then go into the office and get it done." However, "[Karp] would just go in the office and sit and stare at the computer. [He] would do nothing. [He] couldn't get any work done." According to Dr. Soliman, Karp's misrepresentations were just a few examples of the many manifestations of Karp's mental and physical disorders.
{¶ 57} Because Karp's mental disorder contributed to cause both his neglect of the legal matter and his misrepresentations to conceal that neglect, he is entitled to its full mitigating weight.
{¶ 58} I recognize that Gadzheva's immigration status made her extremely vulnerable, but being vulnerable is not the same thing as being harmed.
*832 Gov.Bar R. V(13)(B)(8) provides that "[t]he vulnerability of and resulting harm to victims of the misconduct" is an aggravating factor. The client's vulnerability, standing alone, is not. And here, there is no evidence that Karp's misrepresentations resulted in identifiable harm to Gadzheva.
{¶ 59} The parties stipulated that had Gadzheva been called to testify at Karp's hearing, she would have stated that she had been afraid to leave the country in order to activate her O-1B status due to the uncertainty of whether she accrued any days of unlawful presence in the United States. But there is no stipulation that Gadzheva suffered any identifiable, concrete harm, and the board recognized that it was "unknown what exactly will happen to Gadzheva because of [Karp's] conduct." For example, the record does not show that Gadzheva lost her employment with the dance studio, was ordered to leave the United States, or was denied reentry at the border. Further, Karp's response to relator's letter of inquiry indicated that Gadzheva was seeking to avoid the consequences of her unlawful presence by filing a grievance against him and asserting Karp's ineffective assistance in failing to file a timely petition as a basis for relief. Moreover, on the day of Karp's hearing, Gadzheva accepted an offer to dismiss her malpractice *233 claims against Karp in exchange for his payment of the legal fees that she incurred to hire an attorney to file the new petition. This evidence suggests that Gadzheva faced serious immigration consequences that did not come to pass, but in any case, nothing in the record proves that she suffered any discernible harm that has not been mitigated.
{¶ 60} The majority also discounts Karp's payment of restitution and efforts to mitigate the consequences of his misconduct, his cooperation with the disciplinary process, and the evidence of his good reputation and character.
{¶ 61} The majority states that Karp's payment of restitution was not "timely" because he "waited approximately eight months after he claims that Gadzheva had terminated his representation to issue a refund (and he made the payment only at relator's request)." Majority opinion at ¶ 28. The majority also explains that "while Karp paid $1,225 from his personal accounts to expedite the processing of Gadzheva's I-129 petition when he finally filed it in April 2016, the mitigating effect of that payment was diminished by his subsequent inaction and the resulting dismissal of that petition." Id. However, these conclusions minimize the effect that Karp's depression and hypothyroidism had on his ability to concentrate and accomplish anything. Dr. Soliman noted that people with major depression have impaired executive functioning and often display symptoms of anxiety and panic that can cause them to fail to consider the courses of action that may be taken. Because Karp's mental and physical disorders caused the eight-month delay, his payment of restitution and his effort to rectify the consequences of his misconduct are "timely." And notably, relator concedes that Karp "has done what he can."
{¶ 62} The majority also overlooks our precedent holding that an attorney's eventual cooperation in the disciplinary process is a basis to impose a lesser sanction. See, e.g., Disciplinary Counsel v. Davis, 121 Ohio St.3d 84, 2009-Ohio-500, 902 N.E.2d 25, ¶ 16 ; Columbus Bar Assn. v. Dice , 120 Ohio St.3d 455, 2008-Ohio-6787, 900 N.E.2d 189, ¶ 10-11 ; Disciplinary Counsel v. Boulger , 88 Ohio St.3d 325, 327, 725 N.E.2d 1112 (2000). And with the exception of a false statement and the false evidence that he had signed West's name "per authority," Karp fully cooperated with the disciplinary *833 process. He gave detailed answers in response to relator's letters of inquiry, immediately admitting that he had neglected this legal matter and misled Gadzheva into believing that he had filed the petition. At the hearing, Karp admitted his misconduct and accepted responsibility for it, stipulating to the testimony that relator would have presented. As relator noted in its brief, this "precluded the need for relator to call any witnesses at the hearing, including Gadzheva and West who live in California and Gadzheva's new counsel who lives in Maryland." Relator recognizes that this cooperation deserves significant mitigating effect. And having participated in the whole *234 disciplinary process, relator is in the best position to gauge the value of Karp's cooperation.
{¶ 63} Relator also agrees that Karp presented "ample" evidence of his good character and reputation apart from this incident. The executive director of the Cleveland Metropolitan Bar Association, retired judges from the Eighth District Court of Appeals and the Cuyahoga County Court of Common Pleas, and attorneys who had known Karp throughout his career wrote letters as a testament to Karp's good character and reputation as well as his service to the legal profession in Cleveland. As one of Karp's character references noted, a fully stayed suspension of Karp's law license is sufficient to protect the public and the profession without depriving both of his services.
{¶ 64} Although our cases indicate that "misconduct involving dishonesty, fraud, deceit, or misrepresentation generally warrants an actual suspension from the practice of law," Disciplinary Counsel v. Brockler , 145 Ohio St.3d 270, 2016-Ohio-657, 48 N.E.3d 557, ¶ 24, we nonetheless "may deviate from that rule in the presence of significant mitigating evidence," id. at ¶ 25. See also Disciplinary Counsel v. Potter, 126 Ohio St.3d 50, 2010-Ohio-2521, 930 N.E.2d 307 (absence of a prior disciplinary record, efforts to rectify the consequences of the misconduct, cooperation in the investigation, self-reporting, and evidence of good character and reputation apart from the charged misconduct sufficient to fully stay one-year suspension for violating fiduciary duty as the executor of an estate); Disciplinary Counsel v. Niermeyer, 119 Ohio St.3d 99, 2008-Ohio-3824, 892 N.E.2d 434, ¶ 12-13 (absence of prior misconduct, self-reporting, cooperation in the disciplinary process, acceptance of responsibility for misconduct, indication that misconduct was an isolated event, and evidence of good character and reputation sufficient to stay the entire one-year suspension for altering a document to make it appear that it had been timely filed).
{¶ 65} Here, Karp neglected one client matter, deceived the client to conceal that neglect, jeopardized his client's interests, and made a false statement and presented false evidence during the initial phase of relator's investigation. Nonetheless, he (1) demonstrated that a mental disorder contributed to cause this misconduct, (2) has no prior discipline, (3) cooperated during the disciplinary process, (4) made restitution, (5) attempted to rectify the consequences of his misconduct, (6) showed genuine remorse, and (7) established his good character and reputation apart from this incident.
{¶ 66} In Disciplinary Counsel v. Pfundstein , 128 Ohio St.3d 61, 2010-Ohio-6150, 941 N.E.2d 1180, we held that this type of mitigating evidence warranted a suspension of the attorney's license, with the entire suspension stayed on conditions. In that case, Pfundstein had (1) misrepresented the status of the litigation to his client, (2) failed to act with reasonable diligence and promptness *235 in representing his client, (3) failed to keep his client *834 reasonably informed of the status of the case, (4) failed to respond promptly to his client's reasonable requests for information, and (5) engaged in conduct prejudicial to the administration of justice and adversely reflecting on his fitness to practice law. Noting that his dishonest conduct generally warranted an actual suspension, we nonetheless imposed a stayed suspension because (1) the relator did not show that Pfundstein's conduct actually harmed the client, (2) Pfundstein's mental disability contributed to cause the misconduct, and (3) Pfundstein had no prior disciplinary record, cooperated in the disciplinary process, displayed remorse during the disciplinary proceedings, and demonstrated his good character.
{¶ 67} This conclusion accords with the principle that the disciplinary process exists "not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship and to allow us to ascertain the lawyer's fitness to practice law." Akron Bar Assn. v. Catanzarite, 119 Ohio St.3d 313, 2008-Ohio-4063, 893 N.E.2d 835, ¶ 37. That purpose is upheld here by accepting the recommendation of the parties and imposing a two-year suspension, all stayed on conditions, including the requirements that Karp (1) enter into a contract with OLAP, (2) follow all the treatment recommendations by OLAP and his treating healthcare professional(s), (3) provide relator with quarterly updates as to his compliance with such recommendations, and (4) engage in no further misconduct.