**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Karp,* **Slip Opinion No. 2018-Ohio-5212.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

**Slip Opinion No. 2018-Ohio-5212**

**DISCIPLINARY COUNSEL *v*. KARP.**

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Karp,* Slip Opinion No. 2018-Ohio-5212.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct—Two-year suspension, with 18 months stayed on conditions.*

(No. 2018-0254—Submitted May 8, 2018—Decided December 27, 2018.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2017-023.

_____

**Per Curiam.**

**{¶ 1}** Respondent, Harlan Daniel Karp, of Cleveland, Ohio, Attorney Registration No. 0042411, was admitted to the practice of law in Ohio in 1989.

**{¶ 2}** In a May 4, 2017 certified complaint, relator, disciplinary counsel, alleged that Karp violated ten professional-conduct rules by neglecting a client's immigration matter, failing to reasonably communicate with that client, and failing

to maintain client funds separate from his own property. The parties submitted stipulations of fact, misconduct, and aggravating and mitigating factors and recommended that Karp be suspended from the practice of law for two years, with the entire suspension stayed on two conditions.

{¶ 3} Based on the parties' stipulations of fact and misconduct, the hearing testimony, and stipulated exhibits, a panel of the Board of Professional Conduct found that Karp committed eight of the ten alleged violations. After considering the relevant aggravating and mitigating factors and the sanction imposed for comparable misconduct, the panel rejected the parties' stipulated sanction and instead recommended that Karp be suspended from the practice of law for two years, with 18 months stayed on conditions. The board adopted the panel's report and recommendation.

{¶ 4} Karp objects to the board's recommended sanction and argues that the mitigating factors present in this case warrant the imposition of a two-year suspension, with the entire suspension stayed on conditions. For the reasons that follow, we agree with the board's findings of fact and misconduct, overrule Karp's objection, and suspend Karp from the practice of law for two years, with 18 months stayed on the conditions that he (1) enter into a contract with the Ohio Lawyers Assistance Program ("OLAP"), comply with all treatment recommendations of OLAP and his treating healthcare professionals, and provide relator with quarterly reports demonstrating that compliance and (2) commit no further misconduct.

**Misconduct**

*Count One: The Veronika Gadzheva Matter*

{¶ 5} The parties stipulated and the board found that in 2015, a New Jersey dance studio filed an I-129 Petition for Non-Immigrant Worker seeking an O-1B visa[1] on behalf of Veronika Gadzheva, a Bulgarian ballroom dancer. The United

---

1. O-1B visas are for individuals who possess extraordinary ability in the arts or extraordinary achievement in the motion-picture or television industry.

States Citizen and Immigration Services ("USCIS") granted the petition, and Gadzheva entered the United States on May 11, 2015, with an O-1B visa that expired on February 27, 2018. Soon thereafter, Gadzheva obtained an offer of employment from Patricia West, the owner of a dance studio in California.

{¶ 6} On July 22, 2015, Gadzheva e-mailed Karp about transferring her O-1B visa to West's studio. Karp accepted the case and informed Gadzheva that his fee would be $750 plus a $325 filing fee. Karp told Gadzheva that she could move to California and begin working at West's studio once a new I-129 petition had been filed. Karp also explained that because the petition had to be filed by West and that West would need to sign some forms, the filing "could take a week." By July 31, 2015, Gadzheva had e-mailed Karp approximately 500 pages of documents regarding her existing visa and wired $325 to his client trust account for the filing fee. On August 17, 2015, Karp e-mailed West and requested that she answer a few details pertaining to her studio and her anticipated employment relationship with Gadzheva. In this e-mail, Karp stated that he would e-mail West the completed I-129 for her signature before filing it. West responded on August 24, 2015.

{¶ 7} On September 10, 2015, Gadzheva e-mailed Karp asking whether he had filed the I-129. Karp falsely responded, "Yes. Sent." Several weeks later, Gadzheva wired $750 as payment in full for her legal fees. In early October, Gadzheva informed Karp that she was leaving for California and that she had hoped the petition would be approved soon. Although Karp had not yet filed the petition, he falsely stated, "It [confirmation of approval] should arrive this week. I will email it to you." On October 20, 2015, Gadzheva's former employer requested that the I-129 petition that it had filed on her behalf be revoked. Karp was unaware of that request and the subsequent revocation of the petition until several months later.

{¶ 8} In early November, after receiving an e-mail from Gadzheva inquiring into the status of the petition, Karp responded, "Still pending. Give it another week or two." In the meantime, Karp continued to lead Gadzheva into

believing that he had filed the I-129 petition by answering her questions about what she could and could not do while she was waiting for approval. On December 3, 2015, Gadzheva e-mailed Karp and asked whether she could take a trip back to Europe "when the papers still aren't ready is this gonna be a problem for my status." Karp replied, "No. Your visa (on your passport) is still good."

{¶ 9} From December 2015 to April 2016, Gadzheva and West made numerous requests for proof that the petition had been filed. But Karp consistently misrepresented the status of the case by telling them that the petition had been filed and that it should be approved shortly. Once, he instructed West not to contact USCIS directly, claiming that such contact would cause further delay. And when Gadzheva inquired about restarting the entire process, Karp told her to be patient.

{¶ 10} On April 14, 2016, West demanded that Karp provide the receipt number for Gadzheva's petition. Karp filed the petition with USCIS the next day—more than seven months after he first claimed that he had done so—along with a notice of his representation. Karp had signed West's name in two places on the petition and once on the notice of representation. One of the signatures on the petition was under a disclaimer that stated, "I certify under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition * * * is complete, true, and correct." Although Karp has stipulated that West never gave him authority to sign her name or implied that he had the authority to do so, he nonetheless believed that he had the authority to sign West's name because she and Gadzheva consistently requested proof of a *filed* I-129, which could not be filed without West's signature.

{¶ 11} On April 25, 2016, Karp e-mailed West the receipt number for Gadzheva's petition. The next day, Karp and West received an I-797E form (Notice of Action) from USCIS. The I-797E form is commonly referred to as a request for additional evidence ("RFE"). The RFE not only asked for additional information regarding Gadzheva's classification status, but also informed Karp that, at the

4

request of Gadzheva's former employer, her original petition had been revoked. Without conferring with West or Gadzheva, Karp responded to the notice and indicated that while he sought classification for Gadzheva's extraordinary ability in the arts (an O-1B classification), he had no objection to a classification for her extraordinary ability in athletics (an O-1A classification).

{¶ 12} On May 2, 2016, in response to a request from West, Karp e-mailed her a complete copy of his file. After providing West the file, Karp believed that his representation had ended—even though there is no evidence that either Gadzheva or West communicated such an intention or that Karp ever informed USCIS that he no longer represented Gadzheva. After Karp failed to respond to a second RFE from USCIS, the petition that he had filed on behalf of Gadzheva was deemed abandoned and denied.

{¶ 13} Gadzheva retained new counsel, and on July 11, 2016, a new I-129 petition was filed on her behalf. USCIS granted her a new O-1B visa. However, because Gadzheva's original I-129 petition had been revoked, her immigration status was not valid when she filed the July 11, 2016 petition. Therefore, Gadzheva has to leave the United States in order to activate her new O-1B status. But Gadzheva is afraid to leave the country because the revocation of her original petition may have caused her to begin accruing days of "unlawful presence" in the United States, which could result in her being banned from the United States for three-to-ten years. Accordingly, the board found that Karp's neglect and ongoing misrepresentations to his client could have extremely serious consequences for her.

{¶ 14} Gadzheva filed a grievance against Karp in July 2016. In response to relator's first letter of inquiry, Karp enclosed an unsigned copy of the I-129 petition that he claimed to have filed on behalf of Gadzheva. Karp also falsely stated that West had authorized him to file the I-129 petition. Subsequently, because a signature from West was necessary in order to file the petition, relator sent Karp a letter requesting additional information. Specifically, relator asked

whether Karp had signed West's name on the form, and if so, whether he had indicated that he signed it with authority or whether he made it appear as if West had signed the form. Karp responded, "I signed Ms. West's name on the form and noted I had authority. I had received information to fill out the form from her (attached). A copy of the signed version is attached. Exhibit C." Although Karp claimed that Exhibit C was a copy of the petition that he had filed with USCIS, it was not. Exhibit C indicated that he had signed West's name "per authority," but the petition that was filed with USCIS did not have the "per authority" notation— it just had West's purported signature.

{¶ 15} The board found that Karp's conduct violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(1) (requiring a lawyer to inform the client of any decision or circumstance with respect to which the client's informed consent is required), 1.4(b)[2] (requiring a lawyer to explain a matter to the extent reasonably necessary to permit the client to make an informed decision), 1.4(a)(2) (requiring a lawyer to reasonably consult with the client about the means by which the client's objectives are to be accomplished), 8.1(a)[3] (prohibiting a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Consistent with the parties' stipulations, an additional alleged violation was dismissed based on the insufficiency of the evidence.

---

2. Although the parties stipulated that this allegation would be dismissed, that stipulation was rejected based on clear and convincing evidence that Karp had violated this professional-conduct rule.

3. The complaint stated this violation in terms of Prof.Cond.R. 8.1(b), but the parenthetical explanation of the violation was stated in terms of Prof.Cond.R. 8.1(a). Because the stipulations, the panel, and the board all cite Prof.Cond.R. 8.1(a), and not Prof.Cond.R. 8.1(b), we conclude that the complaint's reference to Prof.Cond.R. 8.1(b) is a typographical error.

*Count Two: Karp's Client Trust Account*

{¶ **16**} From at least June 1, 2015, until at least May 31, 2016, Karp had been using his client trust account to pay personal and business expenses even though he maintained and used an operating account during that time. During that same period of time, he had also been depositing earned fees into—and allowing earned fees to accumulate in—his client trust account beyond the amount necessary to cover bank and credit-card processing fees. Karp explained that because he was a solo practitioner without a bookkeeper or office assistant, it was easier to pay bills from one account than to take the extra step of transferring earned funds from his client trust account to his operating account or personal accounts. Despite Karp's commingling of funds and improper use of his client trust account, there was no evidence that any client funds were misappropriated. And upon learning of relator's investigation into his client-trust-account practices, Karp ceased using that account to pay personal or business obligations.

{¶ **17**} The parties stipulated and the board found that this conduct violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separate from the lawyer's own property) and 1.15(b) (prohibiting a lawyer from depositing his own funds in a client trust account except to pay or obtain a waiver of bank service charges). Additionally, the stipulation that Karp had violated Prof.Cond.R. 1.15(c) was rejected and that violation was dismissed due to insufficient evidence.

### Recommended Sanction

{¶ **18**} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ **19**} As aggravating factors, the parties stipulated and the board found that Karp committed multiple offenses and caused harm to Gadzheva, whose

immigration status has rendered her extremely vulnerable. *See* Gov.Bar R. V(13)(B)(4) and (8). In addition, the board found that Karp acted with a dishonest motive, exhibited a pattern of misconduct that was reflected in his repeated misrepresentations, and engaged in deceptive practices during the disciplinary process. *See* Gov.Bar R. V(13)(B)(2), (3), and (6).

{¶ 20} The board adopted stipulated mitigating factors that included the absence of prior discipline, Karp's timely, good-faith effort to make restitution and rectify the consequences of his misconduct, and evidence of his good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (3), and (5). Dr. Sherif Soliman, a board-certified psychiatrist, testified that Karp suffers from hypothyroidism and major depressive disorder and that those conditions contributed to his misconduct. He reported that Karp has complied with a regimen of prescribed medication that has given him more energy, improved his sleep and concentration, and reduced his feelings of depression. He also opined that he did not find "a psychiatric contraindication to Mr. Karp continuing to practice law." On those facts, the board found that Karp's mental disorder qualified as a mitigating factor. *See* Gov.Bar R. V(13)(C)(7).

{¶ 21} The parties jointly recommended that Karp be suspended from the practice of law for two years, with the entire suspension stayed on the conditions that he enter into a contract with the Ohio Lawyers Assistance Program ("OLAP"), that he comply with all treatment recommendations of OLAP or his treating healthcare professionals, and that he provide relator with quarterly reports demonstrating that compliance.

{¶ 22} We have held that conduct involving fraud, deceit, dishonesty, or misrepresentation usually requires an actual suspension from the practice of law for an appropriate period of time. *Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 190-191, 658 N.E.2d 237 (1995). And while we have acknowledged that "an abundance of mitigating evidence can justify a lesser sanction," *Disciplinary*

*Counsel v. Markijohn*, 99 Ohio St.3d 489, 2003-Ohio-4129, 794 N.E.2d 24, ¶ 8, we have also found that an actual suspension from the practice of law is particularly appropriate when an attorney has made deliberately false statements to a client, *Disciplinary Counsel v. King*, 74 Ohio St.3d 612, 614, 660 N.E.2d 1160 (1996) (citing the reprehensible nature of dishonesty directed toward a client to justify the imposition of a six-month suspension on an attorney who repeatedly assured a client that he had refiled the client's claim even though he had not done so).

{¶ 23} Despite the presence of four mitigating factors and Karp's acknowledgment of his wrongdoing, the board remained troubled by his failure to appreciate the gravity of his misconduct—which included a pattern of misrepresentations to Gadzheva, West, the federal government, and relator—and the very serious consequences that his misconduct may have on Gadzheva and her immigration status. The board considered two cases in which we imposed partially stayed term suspensions on attorneys who made false representations to their clients in an effort to conceal additional attorney misconduct.

{¶ 24} In *Disciplinary Counsel v. Keller*, 110 Ohio St.3d 240, 2006-Ohio-4354, 852 N.E.2d 1195, ¶ 3-5, 14, an attorney neglected a client's personal-injury matter, falsely represented that a lawsuit had been filed on the client's behalf and that he had received a settlement offer, and failed to inform the client that he did not carry professional-liability insurance. Aggravating factors, including the attorney's dishonesty, the client's vulnerability, and the resulting harm to the client, were outweighed by the mitigating factors, which included the absence of prior discipline, the attorney's genuine remorse, evidence of his good character, a qualifying chemical dependency, total compliance with an OLAP contract, a significant period of sobriety, and a series of unfortunate events in the attorney's personal life. *Id.* at ¶ 9-10. Nevertheless, we determined that the attorney's attempts to conceal his neglect and his failure to remedy the harm that he caused warranted an actual suspension from the practice of law. *Id*. at ¶ 13. We therefore

suspended him from the practice of law for two years, with 18 months of the suspension stayed on conditions. *Id.* at ¶ 14.

{¶ 25} And in *Disciplinary Counsel v. Riek*, 125 Ohio St.3d 46, 2010-Ohio-1556, 925 N.E.2d 980, an attorney misappropriated client funds, issued a settlement check to a client when his client trust account contained insufficient funds to honor the check, and lied to his client about why the check had been dishonored. There were no aggravating factors. Mitigating factors included the absence of prior discipline, full and free disclosure to the board and having a cooperative attitude toward the disciplinary proceeding, and positive character evidence. Although the client was not ultimately harmed by the attorney's conduct, we found that the attorney's deception warranted the imposition of an 18-month suspension, with 12 months stayed on conditions.

{¶ 26} Finding *Keller* and *Riek* to be instructive, the board recommended that we suspend Karp for two years, with 18 months of the suspension stayed on the conditions recommended by the parties, with additional requirements that he engage in no further misconduct, pay the costs of these proceedings, and serve a two-year period of monitored probation upon his reinstatement to the practice of law.

### Karp's Objection to the Recommended Sanction

{¶ 27} Karp objects to the board's recommended sanction and argues that a fully stayed suspension is appropriate in this case for two reasons. First, he argues that the board did not accord sufficient weight to his mitigating evidence. And second, he contends that the board failed to consider two cases in which we imposed fully stayed suspensions for comparable misconduct: *Toledo Bar Assn. v. Crosser*, 147 Ohio St.3d 499, 2016-Ohio-8257, 67 N.E.3d 789; and *Disciplinary Counsel v. Fumich*, 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6.

{¶ 28} After a thorough review of the record, we find that the facts surrounding several of the mitigating factors advanced by Karp limit their

mitigating effect. For example, Gov.Bar R. V(13)(C)(3) provides that when considering whether to recommend a lesser sanction, the board may consider "[a] timely, good faith effort to make restitution or to rectify the consequences of misconduct." Here, the board credited Karp for making restitution to Gadzheva and attempting to rectify the consequences of his misconduct. However, Karp waited approximately eight months after he claims that Gadzheva had terminated his representation to issue a refund (and he made the payment only at relator's request). And while Karp paid $1,225 from his personal accounts to expedite the processing of Gadzheva's I-129 petition when he finally filed it in April 2016, the mitigating effect of that payment was diminished by his subsequent inaction and the resulting dismissal of that petition.

{¶ 29} The mitigating effect of Karp's lack of prior discipline and his mental and physical disorders are likewise tempered by their surrounding facts. Although Karp has not been disciplined by this court for prior misconduct, he testified that another client had filed a malpractice claim against him in 2014 for failing to file a memorandum in opposition to a motion for summary judgment. He also stated that that malpractice action contributed to cause his depression.

{¶ 30} Gov.Bar R. V(13)(C)(7) provides that a mental disorder may be a mitigating factor when all the following are shown: (1) a diagnosis by a qualified healthcare professional, (2) a determination that the disorder contributed to the cause of the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified healthcare professional that the attorney will be able to return to the competent, and ethical professional practice of law. Here, it is clear that Karp has been diagnosed with major depressive disorder and an exacerbating physical disorder—hypothyroidism—both of which contributed to his misconduct in this case. A qualified healthcare professional has also offered a prognosis that with continued treatment and monitoring, Karp is capable of practicing law. But it is not entirely clear that Karp has had a *sustained period of successful treatment*.

**{¶ 31}** Karp began to take prescribed medication for his depression in March 2017 and started to participate in psychotherapy in June 2017. Dr. Soliman evaluated Karp in September 2017 and reported that Karp had had "a period of sustained treatment with *some success.*" (Emphasis added). He also suggested that Karp would see greater improvement with more aggressive treatment—including an increased dosage of his antidepressant and additional medication for his hypothyroidism.

**{¶ 32}** Karp's treating professionals agreed with Dr. Soliman's proposal, and Karp began the new treatment regimen in late September 2017. Dr. Soliman noted that when he saw Karp in November (just two weeks before his disciplinary hearing), Karp was responding well to treatment, that his condition had "improved markedly," and that his depression was "essentially in remission." But Dr. Soliman also stated that he used the term "remission" cautiously because it had been a little less than two months since Karp last met the diagnostic criteria for major depression. Therefore, it is not entirely clear from the record that Karp has achieved the *sustained period of successful treatment* necessary for his mental disorder to qualify for maximum mitigating effect under Gov.Bar R. V(13)(C)(7)(c).

**{¶ 33}** Karp's reliance on *Crosser,* 147 Ohio St.3d 499, 2016-Ohio-8257, 67 N.E.3d 789, and *Fumich,* 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6, and his claims that he made full and free disclosure to the board and demonstrated a cooperative attitude toward the disciplinary process are also problematic. Like Karp, both Crosser and Fumich neglected client legal matters and then lied to the clients to conceal that misconduct. But in addition to mitigating factors, there was only one aggravating factor in Crosser and none in Fumich.

**{¶ 34}** Here, the board found that five aggravating factors apply. Karp acted with a dishonest motive, committed multiple offenses, engaged in a pattern of misconduct, and caused harm to Gadzheva. Karp also continued to engage in dishonest conduct during the course of relator's disciplinary investigation. And

due to the dishonesty that Karp exhibited during the disciplinary investigation, we decline to afford significant mitigating effect to his belated cooperation in the disciplinary proceedings. Moreover, these five aggravating factors distinguish this case from *Crosser*, *Fumich*, and other cases in which we have departed from the general rule that a course of dishonest conduct warrants an actual suspension from the practice of law. We therefore overrule Karp's objection and adopt the board's recommended sanction—but without the requirement that Karp serve a two-year period of monitored probation upon his reinstatement to the practice of law.

### Disposition

{¶ 35} Accordingly, Harlan Daniel Karp is suspended from the practice of law in Ohio for two years, with 18 months of the suspension stayed on the conditions that he (1) enter into an OLAP contract, comply with all treatment recommendations of OLAP and his treating healthcare professionals, and provide quarterly reports from OLAP and his treating professionals to verify that he is in compliance with all treatment recommendations and (2) engage in no further misconduct. If Karp violates either of these conditions, the stay will be lifted and he will serve the entire two-year suspension. Costs are taxed to Karp.

Judgment accordingly.

O'CONNOR, C.J., and FRENCH and DEWINE, JJ., concur.

FISCHER and DEGENARO, JJ., concur but would require practice monitoring as a condition of the 18-month stay.

O'DONNELL, J., dissents, with an opinion.

KENNEDY, J., dissents, with an opinion.

_____

**O'DONNELL, J., dissenting.**

{¶ 36} Respectfully, I dissent.

{¶ 37} In my view, the majority fails to accord sufficient weight to the mitigating factors in this case: Harlan Karp's lack of prior discipline; his payment

of restitution; evidence of his good character and reputation; and the hypothyroidism and major depressive disorder that contributed to his misconduct.

{¶ 38} I would adopt the sanction that the parties agreed to in this case: a two year suspension, fully stayed on the conditions that Karp enter into a contract with the Ohio Lawyers Assistance Program ("OLAP") and remain compliant with the treatment recommendations from OLAP and his treating healthcare professionals and that he provide relator with quarterly reports demonstrating his compliance. And I would further order Karp to serve a two year period of monitored probation upon reinstatement to the practice of law in accordance with Gov.Bar R. V(21).

{¶ 39} " '[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public.' " *Disciplinary Counsel v. Guinn*, 150 Ohio St.3d 92, 2016-Ohio-3351, 79 N.E.3d 512, ¶ 16, quoting *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. These measures are all that is necessary to achieve that goal.

---

**KENNEDY, J., dissenting.**

{¶ 40} Because the majority fails to give sufficient weight to the mitigating factors that respondent, Harlan Daniel Karp, presented in this case, including his mental and physical disorders that contributed to cause his misconduct, I dissent from its decision to suspend him from the practice of law for two years with 18 months of the suspension stayed on conditions. As relator, disciplinary counsel, has recognized, the acts of misconduct in this case "are 'blips' in an otherwise nearly 30-year admirable career" that is marked by "ample evidence of good character and reputation outside of the charged misconduct."

{¶ 41} Contrary to the majority's conclusion, Karp established through expert testimony a sustained period of successful treatment of his depression and hypothyroidism, which mitigates his misconduct. Accordingly, the appropriate

sanction to protect the public from further misconduct is a two-year suspension, with the entire suspension stayed on conditions—including entering into a contract with the Ohio Lawyers Assistance Program ("OLAP") and complying with his OLAP contract and the recommendations of his treating healthcare professionals.

{¶ 42} The facts of this case are largely uncontested. Veronika Gadzheva, a Bulgarian ballroom dancer, entered the United States in May 2015 with an O-1B visa that expired in February 2018. Dissatisfied with her employer in New Jersey, Gadzheva received an offer to work for Patricia West at her dance studio in California. In July 2015, Gadzheva contacted Karp to obtain his assistance in transferring her O-1B visa to West's studio and Karp accepted the case. Although Karp told Gadzheva that filing the I-129 petition "could take a week," it took Karp approximately eight months to file it with the government. During that time, Karp falsely informed Gadzheva and West on numerous occasions that he had filed the petition when he had not, and he failed to comply with their frequent requests for proof that it had been filed. When Karp finally filed the petition in April 2016, he signed West's name without her authority.

{¶ 43} In the meantime, Gadzheva's original petition was revoked by the government after she stopped working for the employer who had initially sponsored her visa. This meant that Gadzheva might have lived and worked in the United States without authorization, which could render her inadmissible to the United States for as long as ten years. Gadzheva had to retain a new attorney to file a new I-129 petition on her behalf, and the government granted her a new O-1B visa. However, because Gadzheva's original I-129 petition had been revoked, her immigration status had not been valid when counsel filed the most recent petition, and Gadzheva would have to leave the United States in order to activate her new O-1B status. Gadzheva was afraid to return to Bulgaria to activate the visa without knowing whether her unauthorized stay would preclude readmission to the United States.

{¶ 44} In July 2016, Gadzheva filed a grievance against Karp, and in response to relator's first letter of inquiry, Karp admitted that he had not submitted the petition in a timely manner and that he had misled Gadzheva and West into believing that he had. He also told relator that he had had authority to file the petition on behalf of West's dance studio, and he enclosed an unsigned copy of the I-129 petition that he said he filed on Gadzheva's behalf. However, on further inquiry from relator, Karp falsely stated that he had signed West's name with her authority and provided what he purported to be a copy of the actual petition that he had filed on Gadzheva's behalf—this time with West's signature and the notation "per authority" next to the signature. But this was not a true copy of the petition that Karp had submitted to the government.

{¶ 45} It is undisputed that Karp's conduct fell short of the professional standards demanded of all attorneys. At issue here is what sanction is necessary to protect the public from future misconduct. *See Toledo Bar Assn. v. Hales*, 120 Ohio St.3d 340, 2008-Ohio-6201, 899 N.E.2d 130, ¶ 21. When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases. *Id*. at ¶ 19.

{¶ 46} The parties recommend a two-year suspension, all stayed on conditions. The majority, however, adopts the board's recommendation of a two-year suspension, with only the last 18 months stayed. In my view, the majority fails to properly weigh the aggravating and mitigating factors, and we ought to adopt the recommendation of the parties.

{¶ 47} Significantly, the majority discounts the mitigating effect of Karp's mental disorder. Gov.Bar R. V(13)(C)(7) provides that a mental disorder may be a mitigating factor when all the following are shown: (1) a diagnosis by a qualified healthcare professional, (2) a determination that the disorder contributed to the cause of the misconduct, (3) a sustained period of successful treatment, and (4) a

prognosis from a qualified healthcare professional that the attorney will be able to return to the competent and ethical professional practice of law. The majority agrees that Karp has been diagnosed with major depressive disorder and hypothyroidism, that these disorders contributed to cause his misconduct, and that Karp has presented a prognosis that he is capable of competently and ethically practicing law. The majority, however, asserts that "it is not entirely clear from the record that Karp has achieved the *sustained period of successful treatment* necessary for his mental disorder to qualify for maximum mitigating effect under Gov.Bar R. V(13)(C)(7)(c)." (Emphasis sic.) Majority opinion at ¶ 32.

**{¶ 48}** To interpret a rule promulgated by this court, we apply general principles of statutory construction. *Erwin v. Bryan*, 125 Ohio St.3d 519, 2010-Ohio-2202, 929 N.E.2d 1019, ¶ 22. Consequently, we must read undefined words or phrases in context and then construe them according to rules of grammar and common usage. *Id.* "If a court rule is unambiguous, we apply it as written." *Id.*

**{¶ 49}** The Rules for the Government of the Bar do not define the phrase "sustained period of successful treatment." Gov.Bar R. V(35)(A) through (M). The word "sustained" means "maintained at length without interruption, weakening, or losing in power or quality: PROLONGED, UNFLAGGING." (Capitalization sic.) *Webster's Third New International Dictionary* 2304 (2002). "Successful" means "*gaining* or having gained success," with "success" meaning "the degree or measure of attaining a desired end." (Emphasis added.) *Id.* at 2282. "Treatment" is defined as "the action or manner of treating a patient medically or surgically," and to "treat" someone is "to seek cure or relief of (as a disease)." *Id.* at 2435. "Treatment" is not synonymous with "cured."

**{¶ 50}** That the rule requires only an uninterrupted period of gaining success in seeking a cure of, or relief from, a disorder is important. Due to the limited amount of time to seek treatment between the filing of the grievance and the disciplinary hearing, the rule contemplates that the attorney will not necessarily

be cured of the mental disorder or that the disorder will not necessarily be in remission before the date of the hearing. Rather, the point of the rule is to ensure that the attorney has begun and maintained the course of treatment prescribed by his or her qualified healthcare professional, not that the attorney must prove that he or she is cured.

{¶ 51} Karp began treatment for his depression with prescribed medication in March 2017 and started psychotherapy three months later. Sherif Soliman, M.D., evaluated Karp in September 2017 and reported, "[W]hen I saw [Karp] in September his depression was improving. He had had more energy, better concentration, improved mood and was losing weight, which was significant because one of his manifestations of depression was that he was overeating and gaining weight." Dr. Soliman recommended increasing the dosage of the antidepressant medication and that Karp talk to his general physician to discuss treating his hypothyroidism, and when he reassessed Karp in November 2017, Dr. Soliman noted a "marked improvement. And, in fact, the rate of improvement accelerated significantly in that from when I saw him in September he was a bit better than he had been before, but when I saw him in November he was markedly better. He said that he had a lot more energy, he no longer felt depressed, his concentration was better, and he was—his sleep had normalized." Dr. Soliman continued:

> [Karp's] depression was essentially in remission; although I use that term a bit cautiously because under DSM to be classified as being in remission you need two months of not meeting criteria for major depression. So he was right at that line of two months. Close to it. But he was no longer feeling depressed. As I mentioned early, his concentration was better, energy was better, sleep pattern was better. He was continuing to lose weight, which was a very positive thing.

18

So again, fairly substantial improvement between September and November.

**{¶ 52}** The majority contends that Karp did not establish a sustained period of successful treatment because Dr. Soliman's September 2017 report indicated that Karp had experienced "a period of sustained treatment with *some success*" and Dr. Soliman also testified that Karp was not technically in remission as of his last assessment in November 2017. (Emphasis sic.) Majority opinion at ¶ 31. But to be successful, Karp did not have to be cured of his depression, nor did it have to be in remission. Rather, successful means *gaining* success, and treatment is the manner of *seeking* a cure or relief from a disorder. And here, the evidence demonstrates that for a period of approximately nine months, Karp had been gaining success in his battle with depression, showing improvement over a sustained period of time.

**{¶ 53}** The board, in contrast to the majority, based its recommendation of an actual suspension on finding that Karp had made "multiple misrepresentations to his client, his client's employer, the United States government, and to the Relator" and that "these misrepresentations have very serious consequences." While I recognize that making misrepresentations to a client is serious misconduct, Karp's misrepresentations must be considered within the context of his mental and physical disorders.

**{¶ 54}** Dr. Soliman testified about the association between depression and impaired executive functioning and the inability to plan and weigh the consequences of potential courses of action. He pointed out that individuals with depression may "simply take the path of least resistance" and that "symptoms of anxiety and panic are highly common in individuals with depression. * * * Something comes at them that they don't think they can handle and they become panicked and really fail to consider fully what courses of action are open to them."

**{¶ 55}** Dr. Soliman further explained that depression is not a "categorical disability"; that is, "on a good day you might not even be able to tell they are depressed, but on a bad day they might not be able to get out of the bed. * * * They might do fine with a routine task, but then have more difficulty with something challenging."  He continued:

> For example, if somebody sees a nicely laid out file, as an attorney they might be able to handle the case with no problem.  But if they have several different files that they need to organize or several different attachments they need to look at they may becoming [sic] frustrated and not be able to attend to that more complex or more frustrating, for lack of a better word, task. * * *
>
> * * * [T]he presence of the depression may make it more difficult for him to tackle that complicated file.  So somebody who is not depressed may say all right, I need to first organize this file and then divide the tasks up into the necessary steps; whereas somebody who is depressed may say well, I'll just deal with it later, set it to the side and then go onto something else.

**{¶ 56}** Here, Gadzheva e-mailed Karp approximately 500 pages of documents, but "he couldn't concentrate on organizing the multiple documents provided by the client which * * * were provided as jpeg files, which is a photo format as opposed to a document format.  So essentially that would mean that the pages are individual picture files."  As Dr. Soliman understood the situation, each page of the documents had to be separately opened, printed, and numerically ordered.  Given Karp's poor concentration—a symptom of depression—he was not able to complete this task.  And when Gadzheva contacted him about the status of the petition, he misrepresented that it had been filed "so that [he] could then go into

20

the office and get it done." However, "[Karp] would just go in the office and sit and stare at the computer. [He] would do nothing. [He] couldn't get any work done." According to Dr. Soliman, Karp's misrepresentations were just a few examples of the many manifestations of Karp's mental and physical disorders.

{¶ 57} Because Karp's mental disorder contributed to cause both his neglect of the legal matter and his misrepresentations to conceal that neglect, he is entitled to its full mitigating weight.

{¶ 58} I recognize that Gadzheva's immigration status made her extremely vulnerable, but being vulnerable is not the same thing as being harmed. Gov.Bar R. V(13)(B)(8) provides that "[t]he vulnerability of and resulting harm to victims of the misconduct" is an aggravating factor. The client's vulnerability, standing alone, is not. And here, there is no evidence that Karp's misrepresentations resulted in identifiable harm to Gadzheva.

{¶ 59} The parties stipulated that had Gadzheva been called to testify at Karp's hearing, she would have stated that she had been afraid to leave the country in order to activate her O-1B status due to the uncertainty of whether she accrued any days of unlawful presence in the United States. But there is no stipulation that Gadzheva suffered any identifiable, concrete harm, and the board recognized that it was "unknown what exactly will happen to Gadzheva because of [Karp's] conduct." For example, the record does not show that Gadzheva lost her employment with the dance studio, was ordered to leave the United States, or was denied reentry at the border. Further, Karp's response to relator's letter of inquiry indicated that Gadzheva was seeking to avoid the consequences of her unlawful presence by filing a grievance against him and asserting Karp's ineffective assistance in failing to file a timely petition as a basis for relief. Moreover, on the day of Karp's hearing, Gadzheva accepted an offer to dismiss her malpractice claims against Karp in exchange for his payment of the legal fees that she incurred to hire an attorney to file the new petition. This evidence suggests that Gadzheva

faced serious immigration consequences that did not come to pass, but in any case, nothing in the record proves that she suffered any discernible harm that has not been mitigated.

{¶ 60} The majority also discounts Karp's payment of restitution and efforts to mitigate the consequences of his misconduct, his cooperation with the disciplinary process, and the evidence of his good reputation and character.

{¶ 61} The majority states that Karp's payment of restitution was not "timely" because he "waited approximately eight months after he claims that Gadzheva had terminated his representation to issue a refund (and he made the payment only at relator's request)." Majority opinion at ¶ 28. The majority also explains that "while Karp paid $1,225 from his personal accounts to expedite the processing of Gadzheva's I-129 petition when he finally filed it in April 2016, the mitigating effect of that payment was diminished by his subsequent inaction and the resulting dismissal of that petition." *Id.* at ¶ 28. However, these conclusions minimize the effect that Karp's depression and hypothyroidism had on his ability to concentrate and accomplish anything. Dr. Soliman noted that people with major depression have impaired executive functioning and often display symptoms of anxiety and panic that can cause them to fail to consider the courses of action that may be taken. Because Karp's mental and physical disorders caused the eight-month delay, his payment of restitution and his effort to rectify the consequences of his misconduct are "timely." And notably, relator concedes that Karp "has done what he can."

{¶ 62} The majority also overlooks our precedent holding that an attorney's eventual cooperation in the disciplinary process is a basis to impose a lesser sanction. *See, e.g., Disciplinary Counsel v. Davis,* 121 Ohio St.3d 84, 2009-Ohio-500, 902 N.E.2d 25, ¶ 16; *Columbus Bar Assn. v. Dice*, 120 Ohio St.3d 455, 2008-Ohio-6787, 900 N.E.2d 189, ¶ 10-11; *Disciplinary Counsel v. Boulger*, 88 Ohio St.3d 325, 327, 725 N.E.2d 1112 (2000). And with the exception of a false

22

statement and the false evidence that he had signed West's name "per authority," Karp fully cooperated with the disciplinary process. He gave detailed answers in response to relator's letters of inquiry, immediately admitting that he had neglected this legal matter and misled Gadzheva into believing that he had filed the petition. At the hearing, Karp admitted his misconduct and accepted responsibility for it, stipulating to the testimony that relator would have presented. As relator noted in its brief, this "precluded the need for relator to call any witnesses at the hearing, including Gadzheva and West who live in California and Gadzheva's new counsel who lives in Maryland." Relator recognizes that this cooperation deserves significant mitigating effect. And having participated in the whole disciplinary process, relator is in the best position to gauge the value of Karp's cooperation.

**{¶ 63}** Relator also agrees that Karp presented "ample" evidence of his good character and reputation apart from this incident. The executive director of the Cleveland Metropolitan Bar Association, retired judges from the Eighth District Court of Appeals and the Cuyahoga County Court of Common Pleas, and attorneys who had known Karp throughout his career wrote letters as a testament to Karp's good character and reputation as well as his service to the legal profession in Cleveland. As one of Karp's character references noted, a fully stayed suspension of Karp's law license is sufficient to protect the public and the profession without depriving both of his services.

**{¶ 64}** Although our cases indicate that "misconduct involving dishonesty, fraud, deceit, or misrepresentation generally warrants an actual suspension from the practice of law," *Disciplinary Counsel v. Brockler*, 145 Ohio St.3d 270, 2016-Ohio-657, 48 N.E.3d 557, ¶ 24, we nonetheless "may deviate from that rule in the presence of significant mitigating evidence," *id.* at ¶ 25; *see also Disciplinary Counsel v. Potter,* 126 Ohio St.3d 50, 2010-Ohio-2521, 930 N.E.2d 307 (absence of a prior disciplinary record, efforts to rectify the consequences of the misconduct, cooperation in the investigation, self-reporting, and evidence of good character and

reputation apart from the charged misconduct sufficient to fully stay one-year suspension for violating fiduciary duty as the executor of an estate); *Disciplinary Counsel v. Niermeyer,* 119 Ohio St.3d 99, 2008-Ohio-3824, 892 N.E.2d 434, ¶ 12-13 (absence of prior misconduct, self-reporting, cooperation in the disciplinary process, acceptance of responsibility for misconduct, indication that misconduct was an isolated event, and evidence of good character and reputation sufficient to stay the entire one-year suspension for altering a document to make it appear that it had been timely filed).

{¶ 65} Here, Karp neglected one client matter, deceived the client to conceal that neglect, jeopardized his client's interests, and made a false statement and presented false evidence during the initial phase of relator's investigation. Nonetheless, he (1) demonstrated that a mental disorder contributed to cause this misconduct, (2) has no prior discipline, (3) cooperated during the disciplinary process, (4) made restitution, (5) attempted to rectify the consequences of his misconduct, (6) showed genuine remorse, and (7) established his good character and reputation apart from this incident.

{¶ 66} In *Disciplinary Counsel v. Pfundstein*, 128 Ohio St.3d 61, 2010-Ohio-6150, 941 N.E.2d 1180, we held that this type of mitigating evidence warranted a suspension of the attorney's license, with the entire suspension stayed on conditions. In that case, Pfundstein had (1) misrepresented the status of the litigation to his client, (2) failed to act with reasonable diligence and promptness in representing his client, (3) failed to keep his client reasonably informed of the status of the case, (4) failed to respond promptly to his client's reasonable requests for information, and (5) engaged in conduct prejudicial to the administration of justice and adversely reflecting on his fitness to practice law. Noting that his dishonest conduct generally warranted an actual suspension, we nonetheless imposed a stayed suspension because (1) the relator did not show that Pfundstein's conduct actually harmed the client, (2) Pfundstein's mental disability contributed to cause the

misconduct, and (3) Pfundstein had no prior disciplinary record, cooperated in the disciplinary process, displayed remorse during the disciplinary proceedings, and demonstrated his good character.

**{¶ 67}** This conclusion accords with the principle that the disciplinary process exists "not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship and to allow us to ascertain the lawyer's fitness to practice law." *Akron Bar Assn. v. Catanzarite,* 119 Ohio St.3d 313, 2008-Ohio-4063, 893 N.E.2d 835, ¶ 37. That purpose is upheld here by accepting the recommendation of the parties and imposing a two-year suspension, all stayed on conditions, including the requirements that Karp (1) enter into a contract with OLAP, (2) follow all the treatment recommendations by OLAP and his treating healthcare professional(s), (3) provide relator with quarterly updates as to his compliance with such recommendations, and (4) engage in no further misconduct.

_____

Scott J. Drexel, Disciplinary Counsel, and Karen H. Osmond, Assistant Disciplinary Counsel, for relator.

McGinty, Hilow & Spellacy Co., L.P.A., and Mary L. Cibella, for respondent.

_____